LOUIS H. EVANS, Appellant, *v.* JOHN H. WRENN and CLARENCE BUCKINGHAM, Respondents.

*Stockbroker and customer — duplication of orders to sell stock — meaning of words "I will have to let my stocks go" — it is an authorization not a direction — notice of election to exercise it is necessary — ambiguous instructions by a principal to an agent are at the risk of the former — manner of execution of a direction to sell stock — brokers liable for the misconduct of selling agents employed by them.*

In an action against certain stockbrokers, whose place of business was in Chicago and who were represented in New York city by the brokerage house of Van Emburgh & Atterbury, by a customer of such stockbrokers, it appeared that the plaintiff's orders for the purchase and sale of stocks were given by him directly to Van Emburgh & Atterbury, who reported to the defendants at Chicago, by whom notices, etc., thereof were sent to the plaintiff.

It further appeared that defendants were carrying for the account of the plaintiff 2,000 shares of Rock Island, long, 500 shares of Atchison, long, and 500 shares of Rubber preferred, short; that in response to a telegram for more margins the plaintiff, who was at the office of Van Emburgh & Atterbury, telegraphed the defendants, "I will have to let my stocks go;" that the defendants then instructed Van Emburgh & Atterbury to sell 2,000 shares of Rock Island and 500 shares of Atchison, and to buy 500 shares of Rubber preferred, without stating that the transactions were for the plaintiff's account. The plaintiff also gave directly to Van Emburgh & Atterbury two separate orders each to sell 500 shares of Rock Island and a third order to sell 500 shares of Atchison. Upon the transactions being reported to the defendants, the latter, without consulting the plaintiff, instructed Van Emburgh & Atterbury to buy 1,000 shares of Rock Island and 500 shares of Atchison.

*Held*, that the plaintiff's telegram, "I will have to let my stocks go," authorized the defendants to sell any or all of the plaintiff's stocks which they were carrying for him and to cover the stocks which they had sold for his account;

That if the language of the telegram was ambiguous the principle would apply that instructions from a principal to an agent should be expressed in clear

language, and that if the language is not plain and unequivocal, but is fairly susceptible of different interpretations and the agent in fact is misled and adopts and follows one while the principal intended another, then the principal will be bound and the agent will be exonerated;

That such telegram was an authorization and not a direction to sell, and that, until the defendants had notified the plaintiff of their election to exercise the authority contained in the plaintiff's telegram, the plaintiff was at liberty to give orders directly to Van Emburgh & Atterbury;

That the defendants must, therefore, be regarded as having sold the duplicated stocks for their own account;

That when the plaintiff directed Van Emburgh & Atterbury to sell 500 shares of stock, the defendants did not contract to sell those shares in one block, but in the ordinary manner, viz., in 100-share lots;

That the defendants, although personally innocent, were chargeable with the misconduct of brokers, employed to sell stock for the account of the plaintiff, in selling such stock to themselves.

APPEAL by the plaintiff, Louis H. Evans, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 24th day of September, 1903, upon the report of a referee.

*Alfred B. Cruikshank*, for the appellant.

*F. W. M. Cutcheon*, for the respondents.

Judgment affirmed, with costs, on the opinion of the referee.

The following is the opinion of James L. Bishop, Esq., Referee:

BISHOP, Referee:

This controversy grows out of certain transactions in stocks which occurred on May 9, 1901, at the time of the, so-called Northern Pacific panic.

The defendants are stockbrokers and members of the New York Stock Exchange, having a place of business at Chicago, and represented at New York by the stock brokerage house of Van Emburgh & Atterbury.

For some time prior to the transactions in controversy the plaintiff had been dealing in stocks at New York through the defendants, the transactions being conducted, however, through Van Emburgh & Atterbury as their representatives. The orders for the sales and purchases of stock were given direct to Van Emburgh & Atterbury, and were executed by them. They reported the

transactions to the defendants at Chicago, and the accounts were kept at Chicago from which place the usual notices and statements of the transactions were sent by the defendants to the plaintiff. The relation between the plaintiff and the defendants was that of customer and broker, although Van Emburgh & Atterbury were constituted agents to receive and execute the plaintiff's orders on behalf of the defendants.

All the sales and purchases which are the subject of this inquiry were made at the New York Stock Exchange under the rules and customs of the exchange.

On the 9th of May, 1901, at the opening of the market, the defendants were carrying for the plaintiff 2,000 shares of the stock of the Chicago, Rock Island and Pacific Railroad Company and 500 shares of the Atchison, Topeka and Santa Fe Railroad Company long, and 500 shares of the preferred stock of the United States Rubber Company short.

At the prices bid for these stocks at the opening of the market on that day the plaintiff would have had a credit balance of about $28,000 with the defendants; that is, if his long stocks had then been sold and his short stocks bought in to cover, the defendants would have been indebted to him in about that sum.

The panic which occurred on that day was of short duration. It commenced after eleven o'clock and did not last beyond noon. There was a sudden — almost instantaneous — drop in prices and an almost immediate recovery. It was during this extraordinary break in prices that the transactions in question took place.

The plaintiff was at the office of Van Emburgh & Atterbury at the opening of the exchange, and remained there until about twelve o'clock. He was then absent for a short time, but returned and remained until the closing of the exchange. The offices of the defendants at Chicago were connected with the offices of Van Emburgh & Atterbury in New York by direct wire. The telegraph operators at the respective offices were in the habit of noting upon the back of dispatches the hour at which they were sent or received. At eleven twenty-five A. M. (I refer in every instance to New York time) the defendants telegraphed to the plaintiff, at Van Emburgh & Atterbury's offices, over this wire, "Please give us something." This dispatch was communicated to the plaintiff,

and he understood it to be a request that he should furnish additional margins on his account. His statement is that he saw a dispatch reading, as he remembers it, "How about more margin?" It was on the telegraph operator's desk. He states that when he saw it he said, in the presence of Mr. Louis Atterbury, the manager of the office of Van Emburgh & Atterbury, "I guess I will have to let some of my stocks go." The operator sent a dispatch in reply, at eleven twenty-eight A. M., reading as follows: "I will have to let my stocks go."

I am satisfied from the evidence bearing upon the subject that the dispatch was sent in the language used by the plaintiff. It is extremely probable, however, that the plaintiff had in mind that he would sell, as had been his custom, through Van Emburgh & Atterbury, so much of his stocks as might be necessary, but the language in which he expressed himself was, I am satisfied, the language of the dispatch. I think this is convincingly established by the subsequent transactions and communications between the parties.

Within four or five minutes after the sending of this dispatch, the defendants telegraphed to Van Emburgh & Atterbury, "Sell 2,000 R. I.; 500 Atch. Com.," which was received and reported by the operator as an order to sell the stocks at the market, and a minute later the defendants telegraphed instructions to buy 500 Rubber preferred. These orders were transmitted by Van Emburgh & Atterbury to the floor of the exchange for execution.

Shortly after receiving the dispatch calling for more margins the plaintiff placed an order with Van Emburgh & Atterbury for the sale of 500 Rock Island, and a little later for the sale of another block of 500 Rock Island. He also gave an order for the sale of 500 Atchison, but he is not clear just when that sale was ordered, and in the view of the case which I have taken, I do not think it is important.

These orders, given directly by plaintiff to Van Emburgh & Atterbury, were also transmitted by them to the floor of the exchange for execution, and the particular sales made on these orders have been identified.

At about eleven forty-two A. M. Van Emburgh & Atterbury, having received a report of sale of 500 shares of Rock Island in

four parcels, three of 100 each and one of 200, telegraphed the defendants a report of these sales on account of Evans. This appears to have led the defendants to infer that sales were being made on the plaintiff's account, both on their order and on his direct orders given at New York. In any event, they forthwith telegraphed as follows: "We sent order to sell 2,000 R. I. & 500 Atch. Com. & to buy 500 Rubber pfd. This was acct. Evans. If he is giving the orders there don't duplicate and fix it up." To which Van Emburgh & Atterbury replied, "Evans has sold 1,000 R. I. and 500 Atch., so they have been duplicated," to which the defendants replied, "Buy them back at once if he did not." In the meantime all the orders sent into the exchange had been executed, with the result that sales had been made on the order of defendants of 2,000 Rock Island and 500 Atchison common, and on the direct order of plaintiff of 1,000 Rock Island and 500 Atchison common, and a purchase of 500 Rubber preferred had been made.

In reply to the last dispatch from the defendants Van Emburgh & Atterbury telegraphed, "We will then buy 1,000 R. I. & 500 Atch. at market. Is that O. K.;" to which the defendants replied, "Then buy only 1,000 R. I. and 500. Atch. Com. as that is all you reported as given to you by him."

This order to buy was also transmitted to the floor of the stock exchange and was there executed.

The plaintiff testifies that after he had given the orders to Van Emburgh & Atterbury to sell 1,000 Rock Island and 500 Atchison, he was informed by Louis Atterbury that the defendants had given an order to sell all his stock, and that the stock had been sold.

At about twelve forty-five P. M. the plaintiff telegraphed to the defendants as follows: "I had sold some R. I. & Atch. before your message came. When your message was received asking for money said I would sell stock," to which the defendants replied, "We have bot. the 500 Rubber pfd. We supposed from your message that you wanted to close your acct." The plaintiff then telegraphed, "What prices did you get on my acct.?" to which the defendants replied, "V. & A. sold on your direct order 100 R. I. 141; 100, 140½; 100, 134; 200, 133; 500, 125; 500 Atch. 60. We sold 1,000 R. I. in addition at 130 & bought 300 Rubber pfd.

62¾ & 200 at 63." They subsequently telegraphed to the plaintiff as follows : " When you wired us first this morning you ought to have let us know that you were giving some orders to V. & A. yourself, direct. You said nothing whatever about it. Merely said, I will have to let my stocks go. So we wired V. & A. to sell them and the result was very disastrous loss on the 1,000 R. I. and 500 Atch. that we had to buy back. What can we expect on the balance of your acct. ? Ans." The plaintiff answered, " I wired you that I would sell my stocks, in fact, had sold some of them before your message asking for margins arrived," to which the defendants replied, " No, if you had said you would sell them we would have understood it and avoided this bad loss in having to buy back same, but you said, ' I will have to let my stocks go,' and we presumed you were looking to us to give the orders."

Later in the day the plaintiff telegraphed to the defendants, " I repudiate your orders to Van Emburgh & Atterbury to sell my stocks to-day," and on the next day, before the opening of the market, he telegraphed to them, " I demand that you sell at the market to-day one thousand R. I. and buy five hundred Rubber preferred. Send statement."

One of the orders for the sale of 500 Rock Island given by the plaintiff to Van Emburgh & Atterbury was intrusted for execution to one La Montagne, a broker on the floor of the exchange. He bought all these shares on his own account at 125. Upon ascertaining this the defendants voluntarily credited the plaintiff's account with these shares and afterwards sold them on the plaintiff's order at 168½. Another of the orders for the sale of 500 Rock Island, given by the plaintiff to Van Emburgh & Atterbury, was intrusted for execution to C. D. Belden, a broker on the floor of the exchange. He sold these shares in lots, to wit, 100 at 141, 100 at 140½, 100 at 134 and 200 at 133. Of the latter 100 was taken by Belden on his own account, and it seems to be conceded that the plaintiff's account should be credited with these 100 shares. But the plaintiff insists that the sale of the entire 500 shares was effected by the wrongful act of Belden in taking over 100 shares on his own account, and that he is entitled to a credit for the entire 500 shares.

The plaintiff claims that he has sustained damages by reason of the unauthorized sale of either 1,500 or 1,100 shares of Rock Island,

depending upon whether he is to be credited with the prices realized on the above-mentioned 400 shares sold through Belden.

The basis of the plaintiff's contention is that the defendants had no authority to sell for him any other stocks than those for which he gave direct orders through Van Emburgh & Atterbury. The defendants, on the other hand, contend that they were authorized by the plaintiff's first telegram to sell all his stock, and to close out his account, and that they promptly proceeded to give orders to that effect, which were executed, and that the plaintiff thereafter had no authority to give orders to Van Emburgh & Atterbury to sell through the defendants, and that since the order so given by the plaintiff rendered it necessary for them to buy back the stocks which the plaintiff had ordered to be sold, the plaintiff should be chargeable with the loss which resulted therefrom.

If the plaintiff's contention is right, he is entitled to recover a considerable sum from the defendants, since if the sales which were irregularly made are eliminated, he is entitled to be credited with prices so much higher as to turn the balance of the account considerably in his favor.

If the defendants' contention is correct, the plaintiff is indebted to them, and they are entitled to recover upon one or the other of the counterclaims which they have set up.

The first question to be determined is the effect to be given to the plaintiff's telegram, "I will have to let my stocks go." I am of opinion that the plain import of these words, in the light of the situation of the parties, was to authorize the defendants to sell any or all of the plaintiff's stocks which they were carrying for him and to cover the stocks which they had sold for his account.

As I have already intimated, the plaintiff may not have understood the full import of this message when he sent it, but the message must be given effect according to the language used, and not according to the thought which may have remained unexpressed in the mind of the plaintiff.

Even if the language employed be considered ambiguous, it is susceptible of an interpretation to the effect that the defendants should let the stocks which they were carrying for the plaintiff go; that is, that they should sell them. The principle would then apply that instructions from a principal to an agent should be expressed in

.clear language, and that if not expressed in " plain and unequivocal .terms, but the language is fairly susceptible of different interpretations and the agent in fact is misled and adopts and follows one, while the principal intended another, then the principal will be bound and the agent will be exonerated." ( *Winne* v. *Niagara Fire Ins. Co.*, 91 N. Y. 185, 192, citing Story's Agency, § 74.) (See, also, *Ireland* v. *Livingston*, L. R. 5 H. L. 416; 1 Am. & Eng. Ency. of Law [2d ed.], 1001.)

The telegram which we have interpreted as an authority to the defendants to sell did not, however, terminate the authority which the plaintiff had to sell through Van Emburgh & Atterbury. It was an authorization and not a direction. The defendants had at most an option to sell, which, until its exercise was communicated to the plaintiff, was not inconsistent with a continuance of dealings by the plaintiff through Van Emburgh & Atterbury. When. the defendants ordered the sale of 2,000 Rock Island and 500 Atchison common, they did not make known that it was on Evans' account. If they had done so, all danger of duplicating orders would have been avoided, and it was not until after the plaintiff had given his orders for the sale of 1,000 Rock Island and 500 Atchison common, and they had been accepted through Van Emburgh & Atterbury, that the defendants communicated the fact that their order for the sale of 2,000 Rock Island and 500 Atchison common was for the plaintiff's account. So it happened that they sold 1,000 Rock Island and 500 Atchison in excess of the stocks which they were carrying for plaintiff. It seems to me that as to these duplicated stocks, the defendants must be regarded as having sold them for their own account. It is quite clear that at that time they considered this to be the situation, since they at once ordered Van Emburgh & Atterbury to purchase 1,000 Rock Island and 500 Atchison to cover the excessive sales of these stocks. No authority was sought from or given by the plaintiff for the purchase of these stocks, and the defendants did not then take the position that they had bought these stocks for account of the plaintiff, or that they had sold the excess 1,000 Rock Island and 500 Atchison for his account. On the contrary, when the plaintiff telegraphed, " What prices did you get on my acct.? " the defendants replied, at one

twenty-five P. M., that they had sold on his direct order 100 Rock Island at 141, 100 at 140½, 100 at 134, 200 at 135, 500 at 125 and 500 Atchison common at 60, adding: "We sold 1,000 R. I. in addition at 130," and in the account which they rendered to the plaintiff on May tenth they credited him with the stocks mentioned in their telegram and neither credited nor charged him with the excess 1,000 Rock Island and 500 Atchison, which they had bought and sold. Indeed, it was not until the account which was rendered on the eighteenth of July subsequent that they credited him with the duplicate sales and charged him with the purchase of the 1,000 Rock Island and 500 Atchison.

I am satisfied that the account as rendered on May tenth is a correct account of the transactions between the parties, except so far as it is to be corrected by reason of the misconduct of La Montagne and Belden in taking over for their own account the stocks which they were directed to sell. This misconduct is chargeable to the defendants, although they were personally innocent. So far as the La Montagne stock is concerned, they have acquiesced in the obligation, and have credited the plaintiff with 500 shares of stock in this transaction. These stocks were subsequently sold at 168¾. As to the Belden sale, I am of opinion that the plaintiff is entitled to be credited with the 100 shares sold by Belden to himself. This sale was made at 130. The plaintiff did not learn that this sale had been made by Belden to himself earlier than June, 1901. The price of Rock Island during the month of June went as high as 175¼. The plaintiff disaffirmed the sale apparently as early as June 6, 1901. On that day and the next the stock sold at 173. I think the plaintiff is entitled to be credited with the value of the stock at 173.

As to the other 400 shares of stock sold through Belden, I am of opinion that these sales are not open to objection. The sales were made in four distinct lots of 100 shares each. The purchasers are identified by Mr. Belden, and the plaintiff has not succeeded in showing that any of these purchases were in any respect irregular.

The plaintiff contends that the order was for the sale of the entire block of 500 shares, and that since the sale of a portion was fraudulent, the sale of the entire amount may be repudiated. It does not appear that the defendants contracted to sell the 500 shares

as an entirety, but, on the contrary, it must be assumed that they took the order with the expectation of filling it in the ordinary way, by sales of 100-share lots. (*Marye* v. *Strouse,* 5 Fed. Rep. 483.)

Moreover, the sales were reported to the plaintiff immediately after they were made, and no objection was taken by him that they had been made in lots of 100 shares each. He acquiesced in the mode of sale adopted, and he should not now be permitted to repudiate the sales on that ground, to the prejudice of the defendants.

Crediting the plaintiff with 500 shares of Rock Island at 168¾ and 100 shares at 173, the account shows an indebtedness of the plaintiff to the defendants in the sum of eight thousand three hundred and fifty-seven and 93/100 $8,357.93 dollars, with interest, for which the defendants are entitled to a judgment against the plaintiff.

# 𝕮𝖆𝖘𝖊𝖘

DETERMINED IN THE

# SECOND DEPARTMENT

IN THE

# APPELLATE DIVISION,