Van Voorhis, J.
This controversy arises from the sale of Canadian mining securities. On or about November 1, 1945, plaintiff sold and delivered to defendant 100 units of Grand Chibougamau Prospecting Syndicate for $4,000, which we« paid to plaintiff. Thereafter, and on or about January 29, 1946, defendant subscribed for an additional 10,000 shares of stock in Grand Chibougamau Mines, Ltd., being the same enterprise incorporated, for $24,000 more, of which $10,000 was later paid. Plaintiff sues to recover the balance of $14,000 and interest upon the purchase price of these shares in the corporation, whereas defendant counterclaims to recover the $10,000 which he paid to plaintiff on account of the purchase of these shares,, and the $4,000 previously paid by him for his syndicate units.
The basis for the defenses and counterclaims is fraud and bad faith. The misrepresentations alleged in the answer are that plaintiff held himself out to be a member of the Toronto Stock Exchange, stated that the syndicate units and . corporate shares sold to defendant were registered and qualified for sale in the United States including the State of New York, and that this mining enterprise owned several properties, one of which was an operating gold mine which had produced several millions of dollars of gold, and held on hand a two years’ supply of commercial ore blocked out and being prepared for the mill. These representations by plaintiff are charged with having been consciously false when made. Defendant’s further charge of bad faith, also alleged in the answer, is that plaintiff, although acting as broker for defendant, was interested individually, and as an associate of one Joseph H. Hirschhorn, in profits to be derived from the sale of these shares and units, which fact plaintiff failed to disclose to defendant.
Defendant appeals from a judgment, entered upon the verdict of a jury, dismissing the counterclaims and awarding to plaintiff $17,861.19 for the balance of the purchase price, including interest and costs.
This judgment should be reversed and a new trial granted on account of errors in rulings upon the admission of evidence and in the charge, which could have resulted in a decision on the merits without the jury’s considering what might well have been decisive phases of the case.
*133 A brief recital of further facts is required to preface a review of these rulings. A director of Grand Chibougamau testified that no gold was ever produced by any mine owned by this venture, and that it was just a prospecting company. Its securities proved to be intrinsically worthless. Plaintiff took the witness stand in his own behalf. Although the entire 250,000 shares of issued stock of Grand Chibougamau Mines, Ltd., went into his name (as nominee, according to plaintiff’s testimony, but as owner according to the certificate to the Ontario Securities Commission), plaintiff professed to know nothing about this enterprise. All of the subscriptions to stock were made through plaintiff. He testified that he had agreed with ■ the president of the company to handle all subscriptions for the stock without charge to the mining corporation, but conceded that he had made no inquiry from the president about the legitimacy of the company. He testified that he made no solicitations for subscriptions, that he was ignorant of how people knew that he would accept subscriptions for Chibougamau stock, yet plaintiff testified that 50,000 to 75,000 shares were subscribed through him. Plaintiff’s version is that defendant, like other eager subscribers, sought him out and pleaded with him to obtain these shares and units.
Concerning defendant’s purchase of syndicate units, plaintiff testified that on November 1, 1945, he met a man named Max Okin in Toronto in the office of one J. H. Hirschhorn, that later in the day Okin asked plaintiff on the telephone to obtain a quantity of these units for Okin’s wife and another 100 units for defendant, whom plaintiff did not know, at $40 a unit. Plaintiff denied that any statements were made by him leading to the sale of these units to defendant. On January 29, 1946, according to plaintiff, still without his having seen or talked to defendant, the latter called plaintiff on the telephone and requested him to buy 10,000 shares of the corporate stock. This was after an unsuccessful attempt on the part of defendant, by letter, to purchase at $1 per share. Plaintiff testified that in the telephone conversation he told defendant that he would be obliged to pay $2.40 to $2.50 a share to secure the quantity defendant desired, and that defendant authorized him to proceed with the purchase “ at the best price ”. Plaintiff testified that no shares were then available (it is undisclosed what became of the excess of the 250,000 shares in plaintiff’s name over and above the 50,000 to 75,000 that he said were subscribed), and that he thereafter obtained the shares requested by defendant from fifteen different persons, named in *134 the bill of particulars, who had originally subscribed through him, for a total of $24,920. These shares were not delivered to defendant, but were held by plaintiff against payment of the balance of the purchase price which, as above indicated, amounted to $14,000 after the two payments by defendant aggregating $10,000.
Defendant’s version is different. He admits that Max Okin was a friend of his, who had become interested in this venture. Okin introduced him to Hirschhorn, following which plaintiff called defendant upon the telephone about the purchase of syndicate units on November 1, 1945. Defendant testified: “ When Mr. Hutchison called me on the phone he told me he got a telephone call from Mr. Hirschhorn, his partner in New York, and he told him that he should call me up, and I should give him an order * * Defendant further testified that in this conversation, plaintiff told him that in the New York telephone call from Hirschhorn, whom plaintiff characterized as plaintiff’s partner, the latter had told plaintiff to buy 100 units for defendant. Plaintiff told defendant that they only sold this stock to friends of Mr. Hirschhorn. In the same conversation between plaintiff and defendant, defendant testified that plaintiff made the statements which are alleged in the answer, including a statement that the mine had produced several million dollars worth of gold and that there was more on hand.
Defendant testified that within a month or six weeks after purchasing the syndicate units, plaintiff called him on the telephone and told him that he had just had a call from Hirschhorn to the effect that syndicate units were then selling at five times what defendant had paid for them, and urged him to buy stock in the corporation. Plaintiff repeated, so defendant testified, that the mine had produced several million dollars worth of gold, and that several million dollars worth of ore had been excavated and was waiting to be milled.
The relationship between defendant, Hirschhorn and Okin lies near to the roots of this controversy. Defendant testified that his conversations with plaintiff were almost always preceded by a telephone call to defendant from Hirschhorn, yet everything which was said in the conversations between defendant and Hirschhorn was excluded by the trial court, notwithstanding defendant’s testimony that plaintiff had repeatedly stated that Hirschhorn was his partner. Calling Hirschhorn his partner was an admission against interest which, if believed by the jury, would have bound plaintiff by Hirschhorn’s state *135 ments to defendant (Carroll v. Farley, 113 N. Y. S. 478, leave to appeal denied, 130 App. Div. 901). Plaintiff neither denied nor affirmed relationship with Hirschhorn, and offered no explanation of the status of this mysterious figure, nor of how prospective purchasers of Gfrand Chibougamau stock came flocking to plaintiff’s door. Plaintiff’s version of the transaction implies that someone other than he played a major role, since plaintiff disclaims responsibility for everything except the right to collect the money. Plaintiff testified: ‘ ‘ Mr. Hutchinson, refresh your recollection, how did people know to send Russell A. Hutchison, or R. A. Hutchison in Toronto, Canada, subscriptions for this stock? A. I would imagine it must have been recommended by someone; it certainly was not by me. * * * Q. Who is this mysterious someone ? A. That I would not be prepared to answer.” If that be true, then plaintiff must have been associated with someone who did the promotional work. Defendant says it was Hirschhorn, and was entitled to supplement whatever he was told by plaintiff with whatever Hirschhorn may have said to him that falls within the issues in the case.
It could be true, as plaintiff contends, that in purchasing these securities defendant relied entirely on the judgment of his friend Okin; nevertheless defendant ought not to have been foreclosed from testifying to his version of what took place between him and Hirschhorn. If plaintiff had as little to do with this promotion as he would have us believe, then it may well be that Hirschhorn, as plaintiff’s partner, was the prime mover in creating a market for these securities. Defendant was certainly entitled to develop whether that was the fact.
It was likewise error to exclude evidence tending to show connection between Hirschhorn and the persons purporting to have sold these 10,000 shares to plaintiff for transfer to defendant. This is particularly true with respect to the stock acquired from Dora Hirschhorn, a sister, who testified that she had no money invested.
This leads to the other point raised by appellant, that he should have been permitted to go into the transactions between plaintiff and plaintiff’s fifteen former customers, from whom he allegedly reacquired defendant’s 10,000 shares of stock, in order to develop whether plaintiff himself, and Hirschhorn also, if the latter was plaintiff’s partner, were interested individually in the sale of these shares which plaintiff purported to dispose of as agent or broker. Plaintiff testified that he purchased the 100 syndicate units at 39y2 from a mining engi *136 neer who was one of the original prospectors of Chibougamau, and resold them to defendant at 40. He also admitted that he received a commission from the sellers as well as from defendant in the case of the 10,000 shares of corporate stock subsequently bought by defendant. There is testimony that it was customary to charge commissions both ways. Although a custom to charge commissions to both parties will not be enforced unless brought to the knowledge of the party to be held (2 Mechem on Agency [2d ed.], § 2474, p. 2082), it is assumed, arguendo, that creating plaintiff a “ broker-trader ” with respect to these units, or his charging commissions to buyer and sellers, would not be sufficient to invalidate the sale.
Even so, if these previous sales to plaintiff’s customers of shares were not bona fide sales (as evidently the one to Dora Hirschhorn was not), and if plaintiff, or Hirschhorn in ease they were partners, retained some beneficial interest which was not disclosed to defendant, the transaction would be void both under section 59 of the Securities Act of Canada and under the general principles of agency. Concerning the latter, it is stated in Meyer on “ The Law of Stock Brokerage and Stock Exchanges ” (§ 135, pp. 549-550): “If the execution of the order is at variance with the customer’s instructions or in contravention to the broker’s legal duties, the customer may, at his election, treat it as a nullity, and regard his account as being in the same state as if there had been no execution at all. * * * Examples of cases where the order is executed in a manner contrary to the broker’s legal duties are where the broker himself supplies the stock which he has been directed to purchase or takes the stock which he has been directed to sell * * Cited in support of the foregoing text are Mayo v. Knowlton (134 N. Y. 250); Levy v. Loeb (89 N. Y. 386); Taussig v. Hart (58 N. Y. 425); Taussig v. Hart (49 N. Y. 301); and Steibel v. Lissberger (166 App. Div. 164, affd. 222 N. Y. 604).
Mechem on Agency (2d ed., vol. 2, pp. 1975-1976, note 72) states that the agent “ Cannot sell to or buy from a firm or corporation of which he is a member ”, citing Evans v. Wrenn (93 App. Div. 346, affd. 181 N. Y. 566).
The cases cited by these text writers are in point.
The substance of this rule, established by case law in New York State and elsewhere, has been embodied in section 59 of the Securities Act of Canada, which was applicable where these transactions were executed. In Meyer on “ The Law of Stock Brokers and Stock Exchanges ” (§ 181, pp. 676-679), *137 it is stated: “ Stock and commodity transactions are ordinarily governed by the law of the place where the order is executed, irrespective of where the order is given or where the parties reside. The law of the place where the order is executed will determine even the validity of such transactions, for the parties are deemed to have contracted with reference to the law of that place,” citing Brooks v. People’s Bank (233 N. Y. 87) and other applicable authorities. The transactions in suit were executed by plaintiff in Toronto, Canada, where plaintiff’s office was located.
The trial court erroneously instructed the jury that the Canadian rules for the sale of securities had no relation to this case. This instruction eliminated section 59 of the Securities Act of Canada (which was also excluded when offered in evidence), and no instructions were given in regard to the common law of New York State, embodied in the Canadian statute. Defendant had been prevented from laying a satisfactory foundation for this issue by other rulings on evidence, made upon the theory that it was irrelevant whether plaintiff or his associates were beneficially interested in these securities. The error was substantial. It is well known that selling promoters’ stock in Canadian mining ventures is a prime abuse, especially where, as here, the enterprise is apparently a stock-jobbing venture. It was important to know whether plaintiff or any of his associates owned an interest in the securities which defendant bought and, particularly, whether the sales to plaintiff’s original customers had been bona fide, or whether some of these shares were really still owned by plaintiff or his associates. It was from these customers that plaintiff testified that he reacquired defendant’s shares. Plaintiff’s evidence concerning the original subscriptions to syndicate units and shares of corporate stock by others than defendant, was confined to vague oral generalities, as was the evidence concerning the repurchase of them by plaintiff for defendant, except for such information as is stated in the bill of particulars. Notwithstanding this, the trial court refused to permit defendant’s counsel to interrogate any of the witnesses concerning what actually occurred in respect of those transactions, and would not compel production of documentary evidence on the subject in direct compliance with a demand in defendant’s notice to produce. Such testimony and documentary evidence might well have broken down plaintiff’s bare assertion, by which the jury were not bound, that plaintiff had no personal interest in these securities, or shown that Hirschhorn was interested *138 therein. There was no reason on account of which plaintiff’s vague and unsupported word had to be accepted as final in this regard.
Under the circumstances disclosed, plaintiff’s credibility concerning lack of benefical interest on his part or on the part of any partner of his should have been submitted to the jury to determine whether these orders were executed in violation of plaintiff’s legal duties as a broker, as well as the subject of the alleged fraudulent misrepresentations. In this connection, it was error to have precluded defendant from proving this stock was not registered for trading in the United States. Nothing which has been written in this opinion is intended to indicate how questions of fact in this action should be decided.
The judgment appealed from should be reversed and a new trial granted, with costs to appellant to abide the event.
Glennon, J. P., Dore, Cohn and Shientag, JJ., concur.
Judgment unanimously reversed and a new trial ordered, with costs to the appellant to abide the event.